120

**FLORIDA PEACH GROWERS ASSOCI-ATION, INC., Petitioner,**

v.

**UNITED STATES DEPARTMENT OF LABOR, Peter J. Brennan, Secretary of Labor, and John H. Stender, Assistant Secretary of Labor for Occupational Safety and Health, Respondents.***

No. 73–1934.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1974.

* Consolidated with:
Florida Citrus Production Managers Association v. U. S. Department of Labor, 73–2279; Washington State Horticultural Association v. Brennan, 73–2283; Idaho Horticultural Society v. Brennan, 73–2327; American Farm Bureau Federation v. Brennan, 73–2493; Massachusetts Fruit Growers Association v. Brennan, 73–2513; Michigan State Horticultural Society v. Brennan, 73–2518; North Carolina Apple Grower's Association v. Bren-

nan, 73–2622; National Peach Council v. Brennan, 73–2623; Raza Association of Spanish Surnamed Americans v. U. S. Department of Labor, 73–2690; New York State Wine Grape · Growers Association v. Brennan, 73–2734; Virginia Farm Bureau v. Brennan, 73–2795; Pennsylvania State Horticultural Society v. Brennan, 73–2871; Colorado Apple Administrative Committee v. Brennan, 73–2948.

John D. Conner, Sellers, Conner & Cuneo, Washington, D. C., R. Emmett Kerrigan, New Orleans, La., Lawrence B. Lindemer, Lansing, Mich., Douglas C. Nohlgren, Chicago, Ill., Allen A. Lauterbach, Park Ridge, Ill., John A. Paterracki, Jr., New York City, Joseph C. Russell, Richmond, Va., Winston S. Howard, Denver, Colo., for petitioner.

Peter J. Brennan, Sec. of Labor, John H. Stender, Asst. Sec. of Labor, William J. Kilberg, Sol. of Labor, U. S. Dept. of Labor, Walter H. Fleischer, Eloise E.

**122**

Davies, Dept. of Justice, Washington, D. C., for respondents.

Miriam Guido, Migrant Legal Action Program, Inc., Washington, D. C., Joanne B. Stern, Patricia Butler, National Health Law Program, Los Angeles, Cal., David Lillesand, Camden Regional Legal Services, Bridgeton, N. J., Joseph C. Segor, Migrant Services Foundation, Homestead, Fla., Burton D. Fretz, Santa Maria, Cal., for intervenors.

Before BROWN, Chief Judge, and RONEY and GEE, Circuit Judges.

RONEY, Circuit Judge:

This case comes to the Court of Appeals on petitions to set aside an emergency temporary standard issued pursuant to the Occupational Safety and Health Act of 1970 (OSHA) [1] by the Assistant Secretary of Labor for Occupational Safety and Health [2] affecting the cultivation of seven crops: apples, peaches, grapes, oranges, grapefruit, lemons, and tobacco. The standard, designed to protect farmworkers from exposure to residues on foliage of named organophosphorous pesticides, does not prohibit the use of such chemicals, but fixes the period during which an employee may not enter a sprayed area and requires other employee oriented controls.

In No. 73–2690, certain organizations representing farmworkers (hereinafter the Farmworkers) petition us to set aside only amendments to an original standard first adopted and then changed by the Secretary, on the ground that statutory procedures for amendment were not followed. The remaining petitions, all filed by representatives of food growers (hereinafter the Growers) seek to set aside the standard, both in its original form and as amended, on the ground that there is no substantial evidence to support the promulgation of an *emergency* standard.

OSHA is a new act and the Occupational Safety and Health Administration in the Department is a new agency. The consequent dearth of definitive decisions which might guide the Act's application, requires us to do more than merely review the challenged standard. We must determine *first*, the procedures by which an emergency temporary standard may be amended; *second*, the standard by which the action of the Secretary will be reviewed; [3] and *third*, the merits of the argument that the order should be set aside. This third facet of our task turns on whether there is a "grave danger" to the workers upon which to posit emergency remedial standards.

*The Emergency Temporary Standard*

The Secretary first published the "Emergency Temporary Standard for Exposure to Organophosphorous Pesticides" on May 1, 1973. An amended version was published on June 29. [4] As amended, the standard

1. 29 U.S.C.A. § 651 et seq.

2. The Act places the responsibility for issuing standards on the Secretary of Labor. He, however, has delegated this authority to the Assistant Secretary. Secretary of Labor's Order 12–71, 36 Fed.Reg. 8754 (1971). For convenience we will continue to refer to the Secretary as the responsible official, although the Assistant Secretary actually carried out most, if not all, of the actions in this case.

3. Although two other circuits have considered the standard of review under OSHA, neither case decided this point. The Court in Dry Color Mfrs.' Ass'n v. Department of Labor, 486 F.2d 98 (3d Cir. 1973), discussed the emergency temporary standard there under review in the framework of the substantial evidence test but did not rule on the question, because it vacated the standard for lack of an adequate statement of reasons. *Id.* at 105. Associated Indus. of New York State, Inc. v. United States Dep't of Labor, 487 F.2d 342 (2d Cir. 1973) contains a scholarly discussion of the substantial evidence test in the context of a "permanent" standard issued pursuant to 29 U.S.C.A. § 655(b). Emergency temporary standards are authorized by 29 U.S.C.A. § 655(c) and raise, by their very nature, rather different review considerations.

4. The major changes effected by the amendments, which the Farmworkers now attack on procedural grounds, were (1) the reduction in the number of covered pesticides from 21

(1) defines the seven crops and twelve pesticides covered;

(2) precludes employers from allowing application of a controlled pesticide to any land on which one or more of the covered crops are grown unless all employees, other than applicators, have been removed from the area;

(3) establishes for each crop and pesticide combination a "field reentry safety interval" during which employees who might have substantial contact with foliage may not be permitted to enter treated areas without protective clothing and equipment;[5]

(4) requires employers to warn, bilingually if necessary, employees expected to work in a treated area prior to the expiration of the reentry interval, either orally or by posting signs around the area or notices where the employees usually assemble for instructions, and that records of all warnings be kept;

(5) requires employers to provide protective clothing and equipment which meet designated specifications;

(6) sets standards for cleaning and care of the protective gear;

(7) prescribes sanitation measures, including employer furnished changing facilities (separate from those used for other purposes) with individual clothing storage for each employee and separate storage for pesticide contaminated clothing and equipment, an adequate supply of potable water for emergency washing purposes, and a requirement that employers not permit employees to store or consume food or drink where the food or drink may be exposed to pesticides; and

(8) requires employers to make arrangements to provide necessary medical assistance to employees who may suffer injuries or illness as a result of occupational exposure to pesticides and to instruct crew leaders in recognition of early symptoms of organophosphate poisoning and appropriate countermeasures.

### The Statutory Scheme

■ Standards promulgated under OSHA have the force of law because Section 5 of the Act, 29 U.S.C.A. § 654, imposes upon every employer [6] a duty to

---

[5] to 12; (2) the limitation of protective measures required of employers to workers having substantial contract with treated foliage; (3) the authorization of oral warnings in lieu of signs *and* notices; (4) the definition of "wet areas" (for which reentry intervals are shorter) with more specificity; and (5) the reduction of the reentry intervals for most of the pesticides still covered.

TABLE I.—*Field reentry safety intervals in days for crops treated with organophosphorous pesticides*

| Pesticide | Apples | Oranges, Lemons, Grapefruit | | Grapes | | Peaches | | Tobacco |
|---|---|---|---|---|---|---|---|---|
| | | Dry Area [1] | Wet Area [2] | Dry Area [1] | Wet Area [2] | Dry Area [1] | Wet Area [2] | |
| Azinphosemethyl (Guthion) | 3 | 14 | 3 | 14 | 3 | 10 | 3 | 4 |
| Carbophenothion (Trithion) | 3 | 14 | 3 | 14 | 3 | 10 | 3 | |
| Demeton (Systox) | 3 | 4 | 3 | 5 | 3 | 5 | 3 | |
| Disulfoton (DiSyston) | | | | | | | | 5 |
| EPN | 3 | 14 | 3 | 10 | 3 | 10 | 3 | |
| Methyl parathion | 3 | | | 14 | 3 | 10 | 3 | 3 |
| Mevinphos (Phosdrin) | 3 | 4 | 2 | 4 | 3 | 5 | 3 | |
| Monocrotophos (Azodrin) | | | | | | | | 3 |
| Oxydemetonmethyl (Meta-Systox R) | | | | 4 | 3 | 5 | 3 | |
| Parathion | 3 | 14 | 3 | 14 | 3 | 10 | 3 | 5 |
| Phosphamidon (Dimecron) | 3 | 14 | 3 | | | | | |
| TEPP | 1 | 3 | 1 | | | | | |

[1] Average annual rainfall of 25 inches or less.
[2] Average rainfall above 25 inches or an area where moderate rainfall has occurred, or a moderate wash has been applied, after pesticide application.

38 Fed.Reg. 17216 (1973).

———◆———

6. Section 3 of the Act defines an employer as "a person engaged in a business affecting commerce who has employees, but does not include the United States or any State or

"comply with occupational safety and health standards promulgated under this chapter" or face civil and criminal penalties set forth in section 17, 29 U.S.C.A. § 666.

■ The Secretary may promulgate standards in either of two [7] ways as emergency temporary standards or as occupational safety and health standards, the so-called permanent standards.

■ An emergency temporary standard, such as that under review here, may be issued without regard to the notice, public comment and hearing provisions of the Administrative Procedure Act. Subsection 6(c) of OSHA provides that

[t]he Secretary shall provide, without regard to the requirements of chapter 5 of Title 5 [notice, public comment, and hearing provisions of the APA], for an emergency temporary standard to take immediate effect upon publication in the Federal Register if he determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger.

29 U.S.C.A. § 655(c)(1). The key to the issuance of an emergency standard is the necessity to protect employees from a grave danger. After issuing an emergency temporary standard, the Secretary must set in motion the procedures for promulgation of a permanent standard, which must issue within six months of the emergency standard's publication. 29 U.S.C.A. § 655(c)(3).

■ By contrast, a permanent standard may be issued in order to serve the objectives of OSHA and requires procedures similar to informal rulemaking under the Administrative Procedure Act, 5 U.S.C.A. § 553. Upon determination

that a rule should be issued promulgating such a standard, the Secretary must proceed under subsection (b) of OSHA § 6, 29 U.S.C.A. § 655(b). A subsection (b) proceeding requires that a proposed standard be published in the Federal Register. Publication is followed by a 30-day period during which interested persons may submit written data or comments or file written objections and requests for a public hearing on the proposed standard. If a hearing is requested, the Secretary is to publish in the Federal Register a notice specifying the standard objected to and setting a time and place for the hearing. Within 60 days after the period for filing comments, or, if a hearing has been timely requested, within 60 days of the hearing, the Secretary may either issue a rule promulgating an occupational safety and health standard or determine that no such rule should be issued. 29 U.S.C.A. § 655(b). The same section and procedure also govern modification and revocation of occupational safety and health standards.

■ Whenever the Secretary promulgates a standard he must include "a statement of reasons for such action" in the Federal Register. 29 U.S.C.A. § 655(e). The requirement has been held to apply to emergency temporary standards. Dry Color Manufacturers' Association v. Department of Labor, 486 F. 2d 98 (3d Cir. 1973).

The difference between these two types of standards is of critical importance on this review. Growers stress that the record does not support the need for subsection (c) emergency standards, leaving open all questions which might relate to a review of permanent standards. Farmworkers contend that emergency temporary standards may be modified only through following the subsection (b) permanent standard procedures.

political subdivision of a State." 29 U.S.C.A. § 652(5).

7. The two year authority under 29 U.S.C.A. § 655(a) to promulgate "national consensus standards" as occupational safety and health standards expired April 29, 1973.

## The Factual Background

The emergency temporary standard now under review enjoyed a troubled gestation period. In Fall 1971, the Task Group on Occupational Exposure to Pesticides (hereinafter the Task Group), an interagency task force, was established under the aegis of the Council on Environmental Quality and directed to evaluate the dangers of occupational exposure to pesticide residues. In June 1972, under authority of section 7(b) of OSHA, 29 U.S.C.A. § 656(b), the Secretary appointed the Standards Advisory Committee on Agriculture (hereinafter the Advisory Committee) to assist him in his standard-setting function. One specific responsibility of the Advisory Committee was to submit recommendations regarding a standard on pesticides. The Committee appointed in turn a Subcommittee on Pesticides (hereinafter the Pesticides Subcommittee) to study exclusively the occupational hazards of pesticides. Both the Subcommittee and its parent body held several meetings, open to the public, on the subject.

In September 1972, the Farmworkers filed a petition with the Secretary setting forth data and arguments in support of an emergency standard on pesticides. On October 10th of that year, the Secretary refused the Farmworkers' request because the lack of reliable data on which to base reentry standards barred issuance of an emergency standard. He emphasized, however, that issuance of an emergency standard, when more definitive information became available, was not precluded. In the meantime, he advised, work would continue to establish a permanent standard under the more deliberate procedures of subsection (b).

In November, the Task Group submitted a preliminary special report to the Occupational Safety and Health Administration recommending strict control of organophosphates and establishment of reentry intervals. Early in December this report was withdrawn for amendment. In mid-December, both the Pesticides Subcommittee and its parent Advisory Committee unanimously concluded that neither an emergency nor justification for emergency standards existed. In late February 1973, the Task Group permanently withdrew its November preliminary report because of "inadequate data available to reach scientifically justifiable judgments on uniform national reentry standards." The November report was cited as an example of the inability of expert committees to arrive at valid reentry intervals. Moreover, the Task Group saw "no evidence of a national emergency that would require uniform national reentry standards."

On March 15, the Secretary requested the Advisory Committee to produce a recommended standard. Before doing so, the Committee sought specific assurances from the Director of the Occupational Safety and Health Administration's Division of Standards that their recommendation would be only a proposed standard, subject to modification in light of feedback from interested parties, and would not be effective immediately as an emergency standard. After receiving such assurances, the Advisory Committee recommended a proposed standard.

On the same day, the Farmworkers brought an action for injunction and declaratory relief in the District Court for the District of Columbia, seeking judicial review of the Secretary's failure to issue emergency temporary standards protecting agricultural workers from the occupational hazards of pesticides. Thomas v. Brennan, Civ.Act. No. 502–73, D.D.C. (filed March 15, 1973). One month later, the Assistant Secretary of Labor signed the original version of the rule entitled "Emergency Temporary Standard for Exposure to Organophosphorous Pesticides." Six days later the Farmworkers' court action was voluntarily dismissed. The following week, on May 1, 1973, the rule was published in

the Federal Register.[8] The Chairman of the Pesticides Subcommittee, "shocked" that the standard had been promulgated on an emergency basis, resigned.

The Growers petitioned the Occupational Safety and Health Administration for reconsideration and repeal of the standard. Then Florida Peach Growers Association, Inc. and the Florida Citrus Production Managers Association filed petitions in this Court for review of the standard. Other growers' organizations petitioned other circuits for review. The petitions in other circuits were subsequently transferred to and docketed in this Court. Motions addressed to this Court for a stay were denied when the effective date of the standard was postponed by the Secretary in response to the petitions for reconsideration.[9] On June 29, the Secretary published the subject of our review, an amended emergency standard effective July 13.[10]

The Growers immediately moved to stay that effective date. A panel of this Court issued a stay, pending further order of the Court. The Government's motion to vacate the stay was denied. On July 6, the Farmworkers petitioned the District of Columbia Circuit for review of the Secretary's dilution of the original standard. Their petition was transferred here on the Government's motion. All petitions for review of the standard were consolidated on August 6 upon an unopposed Government motion.

The petitions for review and motions for stay are in accordance with OSHA's judicial review section, which provides:

Any person who may be adversely affected by a standard issued under this section may at any time prior to the sixtieth day after such standard is promulgated file a petition challenging the validity of such standard with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for a judicial review of such standard. . . . The filing of such petition shall not, unless otherwise ordered by the court, operate as a stay of the standard. The determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole.

29 U.S.C.A. § 655(f).

### The Farmworkers' Petition Opposing Modification of Temporary Standards

The Farmworkers contend that the Secretary was without authority to issue an amended emergency standard without compliance with the procedures for promulgation of a permanent standard. They want the original May 1 standard reinstated.

Citing the Act's provision for standard promulgation, section 6, 29 U.S.C.A. § 655, they first refer us to language in subsection (c) providing that an emergency temporary standard shall be effective until superseded by a permanent standard promulgated in accordance with the procedures specified in subsection (b). Clearly, the amended standard, specifically titled as an emergency temporary standard, does not qualify as a permanent standard. The Farmworkers suggest that, there having been no valid supersession by a permanent standard, the original promulgation remains in effect. The language they rely on, however, does no more than establish the general method and time frame for replacing an emergency temporary standard with an occupational safety and health standard, the so-called permanent standard. It does not prohibit amendment of an emergency temporary standard in the same manner in which a temporary standard may be issued in the first place.

The Farmworkers next argue that subsection (b) provides the exclusive procedure for modifying or revoking

8.  38 Fed.Reg. 10715 (1973).

9.  38 Fed.Reg. 15729 (1973).

10.  38 Fed.Reg. 17214 (1973).

"any occupational safety and health standard," which they contend includes an "emergency temporary standard." The amendments were issued without provision for the statutory 30-day comment period or the public hearing required upon the demand of an interested party and clearly do not satisfy subsection (b) procedural requirements. We read subsection (b), however, as describing the procedure to be followed with regard to modification of standards intended by Congress to be more permanent than the emergency temporary standards which have a maximum duration of six months.

■ Farmworkers' position is contrary to the concepts underlying the Secretary's authority to issue emergency standards. It is inconceivable that Congress, having granted the Secretary the authority to react quickly in fast-breaking emergency situations, intended to limit his ability to react to developments subsequent to his initial response. Although the Secretary decided here that his initial standards were too broad, in other circumstances he might first issue standards too narrow to protect employees against the grave danger envisioned by the Act. In such a case, adherence to subsection (b) procedures would not be in the best interest of employees, whom the Act is designed to protect. Such lengthy procedures could all to easily consume all of the temporary standard's six months life. We will not so read the Act "as to take from the [Secretary] the discretionary power to mould remedies suited to practical needs . . . ." NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 351–352, 73 S.Ct. 287, 291, 97 L.Ed. 377 (1953). We hold that emergency temporary standards may be amended in the same manner and under the same criteria as govern their initial issuance.

11. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971); General Telephone Co. v. United States, 449 F.2d 846 (5th Cir. 1971); City of Chicago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731 (1971); Boating Indus. Ass'n v. Boyd, 409 F.2d 408 (7th Cir. 1969);

Accordingly, the petition for review in No. 73–2690 is denied.

### The Scope of Review

On the Growers' petition we are faced with the threshold question of determining the standard by which we are to review emergency temporary standards. The words of section 6(f) clearly require that a review determine if the Secretary's determinations are supported by substantial evidence in the record taken as a whole. At oral argument, however, the Government suggested that the arbitrary and capricious standard, and not the substantial evidence test, is the appropriate standard of review for an exercise of quasi-legislative discretion in informal rulemaking, citing cases that refused to apply the substantial evidence test in review of informal decision making.[11] To establish that Congress intended to adopt a standard less rigorous than the substantial evidence test, the Government quoted a passage from the Act's legislative history:

*Standards—Pre-enforcement Review.*—The Senate bill permitted pre-enforcement judicial review by anyone adversely affected by any standard in his local circuit court of appeals provided he filed within 60 days after the promulgation. Pre-enforcement review was limited by the House amendment to the D.C. Court of Appeals and to within 30 days of issuance. The "substantial evidence" test was the basis of court review in the House amendment; in the Senate bill, the more vigorous standards generally applicable to review of rules would have been applicable. Review in the local Circuit Court of Appeals, the use of the "substantial evidence" test, and a 60-day limitation on the appeal time were accepted by the conferees.

Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330 (1968). In none of these cases, however, was there a statutory provision mandating the substantial evidence test. Instead, these cases apply the general review provisions of the APA. 5 U.S.C.A. § 706.

Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970, at 1189 (Comm. Print 1971), *also reported at* 1970 U.S.Code Cong. & Admin.News p. 5232. The Government suggests that the House and Senate conferees mistakenly assumed that "standards generally applicable to review of rules" (in practice the arbitrary and capricious standard) were "more vigorous" than the substantial evidence standard, and that they chose what they considered the relatively weaker standard for review.

The quotation, however, is nothing more than the House managers' explanation of how differing House and Senate provisions were reconciled. The original House bill mandated formal rulemaking "on the record" for promulgation of standards, and provided for review under the substantial evidence test. The Senate version called for informal rulemaking with no specific reference to the standard of review. The conferees accommodated the Senate's desire for administrative convenience and flexibility by accepting informal rulemaking procedures, but placated House concern for protection of employers from arbitrary burdens imposed by a massive federal bureaucracy, but adopting the substantial evidence test for judicial review. Thus, although the substantial evidence test is anomalous in the context of informal rulemaking and would not apply were review governed solely by the APA,[12] Congress applied that test as a result of a legislative tradeoff. *See generally* Associated Industries of New York State, Inc. v. United States Department of Labor, 487 F.2d 342 (2d Cir. 1973).

After *Associated Industries* decided this issue contrary to the Secretary's contentions, the Government's line of reasoning was abandoned. The Government now argues that the substantial evidence test only applies to subsection (b) standards that have been promulgated after an informal public hearing.[13] Subsection (f) refers, however, to "a standard issued under this section" which also includes emergency temporary standards.

Alternatively, the Government argues that, if the substantial evidence test is to be applied, its application should be less rigorous than would be the case were a fully developed adversary record before us. Force of circumstances supports this contention to a degree. The type of administrative proceeding and the form of record it produces will influence the method of review.[14] As Judge Friendly noted in *Associated Industries:*

it may well be that the controversy is semantic in some degree, at least in the context of informal rulemaking . . . Commentators have suggested that in the "class of cases in which the ground for challenging the agency action is the inadequacy of its evidentiary basis, it is difficult to imagine a decision having no substantial evidence to support it which is not 'arbitrary', or a decision struck down as arbitrary which is in fact supported by 'substantial evidence'," and that the true significance of the substantial evidence rule is in limiting the

---

12. *See* 5 U.S.C.A. § 706; United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

13. *Associated Industries*, concerned with a standard promulgated pursuant to subsection (b), did not decide this issue. For support the Government quotes a Department of Labor regulation. Section 6(b)(3), providing a hearing on objections to a proposed standard, and section 6(f), assuring judicial

review pursuant to the substantial evidence in the record as a whole test, when read together are said to

suggest a Congressional expectation that the rule making would be on the basis of a record to which a substantial evidence test, where pertinent, may be applied in the event, an informal hearing is held.

29 C.F.R. 1911.5(a)(2) (1973).

Nothing in the statute itself, or in the legisltive history, supports such a distinction.

14. *See* cases cited in n. 11, *supra.*

agency to the confines of the public record. . . . While . . . there may be cases where an adjudicative determination not supported by substantial evidence . . . would not be regarded as arbitrary or capricious, . . . in the review of rules of general applicability made after notice and comment rulemaking, the two criteria do tend to converge.

487 F.2d 342 at 349–350 (citations and footnote omitted).

Thus it seems clear that even with the required substantial evidence test, our review basically must determine whether the Secretary carried out his essentially legislative task in a manner reasonable under the state of the record before him.

The state of the record in this case is one of the difficulties besetting our review function. The administrative record is comprised of some 238 documents occupying approximately two and one half feet of shelf space. It includes such items as letters between Government officials, volumes of transcribed Advisory Committee and Pesticide Subcommittee hearings, Senate hearings and committee reports, the Farmworkers' petition in Thomas v. Brennan, *supra*, case reports of pesticide poisonings, full length texts on the pharmacology of the organophosphates, copies of other agencies' regulations, an abstract of OSHA, studies by the staff of the Task Group on various aspects of the problem, state public health reports and other statistical sources. The most common items in the record are copies of articles published in scientific journals. These run the gamut from descriptions of the symptoms notice in outbreaks of pesticide poisoning among farmworkers, to investigations of the factors influencing the decay of the organophosphates after application, to case reports of children who swallowed pesticides, to studies of various clinical effects of the organophosphates on mammalian species. A large group of articles is made up of contributions to the advancement of research methodology and measurement technology.

A record of this nature is not as easily reviewable as one in which the issues in dispute have been focused narrowly in an adjudicatory proceeding, or one in which precise findings of fact point us in the right direction. In this case judicial proceedings have taken the full six month period since publication of the amended standard.[15] Since the standard has been stayed during our review, even an affirmance would be a hollow victory for the Secretary.

### The Merits

We find no substantial evidence in the record considered as a whole to support the determination by the Secretary that emergency temporary standards were necessary within the demands of section 6(c). There is an abundance of evidence that emergency standards are not necessary. The investigative groups convened by the Government to study the problem of occupational exposure to pesticides—the Pesticides Subcommittee, the Advisory Committee, and the Task Group—all firmly concluded that no emergency existed and that there was no justification for use of an emergency temporary standard. Although these findings by his own investigators do not preclude the Secretary from issuing an emergency standard, they indicate the strength of the evidence contrary to his determination.

Extraordinary power is delivered to the Secretary under the emergency provisions of the Occupational Safety and Health Act. That power should be delicately exercised, and only in those emergency situations which re-

---

15. The decision in Dry Color Mfrs.' Ass'n v. Department of Labor, 486 F.2d 98 (3d Cir. 1973), was handed down just over five months after publication of the emergency temporary standard there in question.

quire it.[16] The promulgation of any standard will depend upon a balance between the protection afforded by the requirement and the effect upon economic and market conditions in the industry. As articulated by the Chairman of the Subcommittee on Pesticides, who resigned in "shock" upon finding that the recommended standards were issued on an emergency basis: "It is essential that employees be protected against exposure to highly toxic materials, but this should be done without eliminating the agriculture enterprise and the associated jobs."

■ The need for a serious emergency upon which to ground temporary standards is reflected in the words of the Act which require the Secretary to determine "(A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger." The Act requires determination of danger *from* exposure to harmful substances, not just a danger *of* exposure; and, not exposure to just a danger, but to a *grave* danger; and, not the necessity of just a temporary standard, but that an emergency standard is necessary.

The reasons published by the Secretary with the standards do not themselves evidence a factual need for emergency standards. The record supports the need for some standards, but not emergency standards. The Secretary's findings were that:

(1) The pesticides listed in the standard below are highly toxic; (2) that premature exposure to them would pose a grave danger; (3) that farm workers have in the past growing seasons, are now, and are expected to be in the near future exposed to these pesticides; and (4) that the standard set out below, based on the recommendations of the Standards Advisory Committee on Agriculture and suggested field reentry safety intervals from the Environmental Protection Agency, is necessary to regulate such exposure so as to protect the workers from the danger.

38 Fed.Reg. 10716 (1973).

The able Government brief indicates the existence of an emergency because of the ban on the use of DDT, which in

---

16. That Congress intended a carefully restricted use of the emergency temporary standard is reflected in the legislative history of both the Senate and the House. As pointed out by the Senate Labor and Public Welfare Committee:

> *Emergency Standards.*—Because of the obvious need for quick response to new health and safety findings, section 6(c) mandates the Secretary to promulgate temporary emergency standards if he finds that such a standard is needed to protect employees who are being exposed to grave dangers from potentially toxic materials or harmful physical agents, or from new hazards for which no applicable standard has been promulgated. Upon publication of such an emergency temporary standard, the Secretary must begin a regular standard-setting procedure for such hazard, which proceeding must be completed within six months.

Legislative History, *supra,* at 147, 1970 U.S. Code Cong. & Admin.News at p. 5184.

In recommending the Senate-House Conference Report for final adoption, Congressman Steiger of Wisconsin, a House member of the Conference Committee reported:

> TEMPORARY EMERGENCY
> STANDARDS
>
> Section 6(c) provides for the expedited procedure for promulgating emergency standards in accordance with the desires of this House. It is intended that this procedure not be utilized to circumvent the regular standard-setting procedures. It should be used only for those limited situations where such emergency standards are necessary because employees are exposed to grave danger from substances or agents determined to be toxic or physically harmful agents, or new hazards. Section 6(c)(1) (B) makes it clear that it is also necessary that the Secretary determine that such a standard is necessary to protect employees from such danger. Thus, where the state of the art is incomplete or in some way lacking so that a determination cannot be made as to whether such a standard will protect employees, in such instances the Secretary would utilize the regular standard-setting procedures as provided in subsection 6(b) and not the emergency standard-setting authority.

Legislative History, *supra,* at 1218.

turn increases the usage of the pesticides listed in the standard, and because of the approach of the 1973 growing season with seasonal peaks of exposure in the months of June, July, August, September, and October. The published reasons and the record give us no indication that the Secretary made a before-the-fact finding that an emergency situation existed on this basis. The Growers point out that the use of DDT on the crops covered by the standard was banned before the Secretary ever initiated this proceeding in 1971, and that ample time existed for promulgation of a standard under section 6(b) to become effective for the 1973 growing season. The listed pesticides have been in long time use.

The Secretary's heavy reliance on the toxicity *per se* of the organophosphorous pesticides to support the allegedly grave danger to agricultural employees through residue exposure is unjustified. In the published standards the Secretary seems to rely on the Senate report "that an estimated 800 persons are killed each year as a result of improper use of pesticides, and another 80,000 injured." This report refers to *improper use*, and encompasses all pesticides.

The Growers concede the high toxicity of these pesticides in the laboratory,[17] but assert that it has little bearing on the hazard to which the emergency standard is addressed, the occupational exposure of agricultural workers to organophosphorous residues on foliage. The Secretary points to statistics on deaths and injuries caused by pesticides. The statistics cited include deaths of all kinds, accidental ingestion by children, industrial accidents, accidents involving spraymen and their helpers, and suicides. The Growers argue that there is a substantial and significant difference

in the toxicity *per se* of an organophosphorous pesticide and that of any of its residues that may remain on sprayed foliage, because the organophosphates start to decompose rapidly immediately upon application. They, therefore, challenge the Secretary's citation of sources cataloging the symptoms of severe organophosphate poisoning, because they describe the afflictions of persons having primary contact with pure or active organophosphates. They refer us instead to record documents detailing the generally mild nature of the relatively few cases of illness reported by crop workers exposed solely to residues. The studies of the occasional outbreaks of organophosphate poisoning among farmworkers exposed to residues indicate the nature and degree of the danger.[18] From time to time a group of workers will experience nausea, excessive salivation and perspiration, blurred vision, abdominal cramps, vomiting, and diarrhea, in approximately that sequence. There is substantial evidence that farmworkers occupationally exposed to organophosphate residues on foliage may experience headache, fatigue, and vertigo. These are not grave illnesses, however, and do not support a determination of a grave danger. A relatively small number of workers experience these difficulties, and it has been going on during the last several years thus failing to qualify for emergency measures. No deaths have been conclusively attributed to exposure to residues. The Subcommittee on Pesticides reported it was unable to find a single authentic record of a fatality resulting from a person entering or working in a field treated with a pesticide. The Secretary has pointed to no evidence to the contrary.

Statistics of "acute poisonings" of agricultural workers fail to distinguish be-

---

17. Toxicity is the inherent capacity of a substance to produce injury or death. Hazard is a function of toxicity and exposure and is the probability that injury will result from the use of a substance in a given formulation, quantity, or manner. If taken in sufficient quantities, even water will cause death.

18. The term "outbreak" is a flexible one. While one "outbreak" reported in the record affected 94 workers, a number of whom required hospitalization for a day or two, another consisted of 10 workers who consulted physicians complaining of nausea, vomiting, and diarrhea.

tween farmworkers exposed only to residues and persons responsible for applying the pesticides.[19] Further, the statistics do not meaningfully break down injuries by type of pesticides. Thus, the Secretary would support his finding of danger with statistics of deaths and injuries due to causes which the standard he promulgated will not correct. The ultimate picture in this record is one of only a few farmworkers made ill by organophosphate residues relative to the mass of agricultural workers in contact with treated foliage.

The Secretary seeks to justify his reliance on these statistics with evidence that agricultural injury statistics seriously underreport the incidence.[20] He argues that the statistics he used are the best available. Granting that it is so, little is proven. Some of the very reasons why the statistics understate the true extent of the problem reinforce the Growers' reading of the evidence. That farmworkers do not report some illness because the symptoms are relatively minor merely supports the conclusion that the situation is not sufficiently grave to warrant use of subsection (c) procedure. Similarly, the suggestion that physicians may fail to diagnose pesticide poisoning as such because it mimics the flue is not persuasive of any grave danger.

We reject any suggestion that deaths must occur before health and safety standards may be adopted. Nevertheless, the danger of incurable, permanent, or fatal consequences to workers, as opposed to easily curable and fleeting effects on their health, becomes important in the consideration of the necessity for emergency measures to meet a grave danger.

In sum, considering the record as a whole, the Secretary has not shown by substantial evidence that agricultural workers are exposed to a grave danger from exposure to organophosphorous pesticide residues on treated plants that must necessarily be protected by an emergency temporary standard. We, of course, do not intimate any opinion as to the feasibility of the published standard to furnish adequate protection, were an emergency shown, nor does our determination in any way reflect consideration of the propriety of a permanent standard promulgated under subsection (b) of the Act.

All petitions for review, except for that in No. 73–2690, are granted and the Emergency Temporary Standard is determined to be invalid and is vacated.

---

19. When toxicologists speak of poisoning they are not referring to the layman's concept of the victim turning blue, twitching convulsively, etc. Rather a person is "poisoned" if any of his body functions has been impaired through introduction of a foreign substance into his system. This definition says nothing about the degree of impairment. Thus episodes of "acute organophosphate poisoning" cover a considerable gamut, from cases in which symptoms are no more distressing than those of a common cold to those in which a patient is veritably snatched from the jaws of death by heroic therapeutic measures and to death despite such measures. The symptoms of minor and intermediate severity poisoning have already been detailed. . A severe case of organophosphate poisoning may result in tremors, paroxysmal tachycardia (abrupt attacks of excessively rapid heart action), respiratory difficulty, convulsions, pinpoint pupils, pulmonary edema (effusion of serous fluid into the lungs), collapse, and coma.
The toxicity of the organophosphates results from inhibition of the enzyme cholinesterase, which plays an important role in the appropriate cessation of nerve impulse transmission. In this they are similar to agents of chemical warfare ("nerve gas"). Absorption can occur through the eyes, the unbroken skin, and the respiratory and intestinal tracts.

20. One cross-section interview study in the record suggests that California workmen's compensation statistics on pesticide poisonings of agricultural workers reflect only $\frac{1}{50}$ to $\frac{1}{100}$ of actual occurrences.