W. J. USERY, Jr., Secretary of Labor, United States Department of Labor, Plaintiff,

v.

The BABCOCK AND WILCOX COMPANY, Defendant.

Civ. A. No. 4–72290.

United States District Court, E. D. Michigan, S. D.

Nov. 24, 1976.

Karl Overman, U. S. Dept. of Labor, Detroit, Mich., for plaintiff.

James E. Brenner, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

This suit was initiated by the Secretary of Labor against Babcock and Wilcox Company, alleging, *inter alia,* that the defendant discharged one of its employees, Sammie Dedman, in violation of the anti-discrimination provision, § 11(c), of the Occupational Safety and Health Act of 1970 (29 U.S.C. §§ 651–678), (hereinafter OSHA), which provides:

"No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter."

The defendant has moved for partial summary judgment arguing that even if the allegations of the plaintiff, as supported by

Dedman's deposition testimony are true, an employee has no explicit or implicit right to refuse a work assignment under OSHA and, therefore, the plaintiff fails to state a claim for which relief may be granted.

Whether this motion is construed as one for summary judgment or one more properly brought on the pleadings under Rule 12(b)(6), the following facts are assumed as true:

1. The defendant corporation is subject to the OSHA requirements.
2. On April 13, 1973, Sammie Dedman was an employee of the defendant corporation.
3. On that date he objected to and/or refused to work under what he felt were very dangerous conditions.[1]
4. There was insufficient time to eliminate the danger through resort to regular administrative channels.
5. The defendant fired the plaintiff on April 13, 1973 for refusing to undertake the required work assignment.

## ISSUE

It is conceded that there is no explicit right, under OSHA, to refuse a work assignment because of what an employee feels is a dangerous working condition.[2] However, the Secretary of Labor has issued an administrative regulation which interprets OSHA as implying such a right under certain limited circumstances. The immediate question before the Court is whether it should uphold the Secretary's regulation as consistent with the Act.

## DISCUSSION

### A.

The Secretary of Labor premises his action against the defendant on its published interpretative rule 29 CFR 1977.12(b)(2) which reads:

1. According to deposition testimony, six pipefitters employed by the defendant were required to attach valves to the underside of a hopper assembly weighing many tons and they refused, claiming that the hopper was a sus-

pended load and that it was dangerous to work under it.

2. Indeed the Secretary acknowledges this in 29 CFR 1977.12(b)(1).

"However, occasions might arise when an employee is confronted with a choice between [not] performing assigned tasks or subjecting himself to serious injury or death arising from a hazardous condition at the workplace. If the employee, with no reasonable alternative, refuses in good faith to expose himself to the dangerous condition, he would be protected against subsequent discrimination. The condition causing the employee's apprehension of death or injury must be of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a real danger of death or serious injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels. In addition, in such circumstances, the employee, where possible, must also have sought from his employer, and been unable to obtain, a correction of the dangerous condition."

As stated above, for purposes of this motion only, it is assumed that Sammie Dedman complied with the restrictions and conditions of this rule.

The Secretary's authority to promulgate interpretative rules and regulations is found in 29 U.S.C. § 657(g)(2):

"The Secretary [of Labor] and the Secretary of Health, Education, and Welfare shall each prescribe such rules and regulations as he may deem necessary to carry out their responsibilities under this chapter, including rules and regulations dealing with the inspection of an employer's establishment."

It is the defendant's assertion that Rule 1977.12(b)(2) is beyond the scope of the Secretary's rule-making power because it is inconsistent with the Act. Supporting such a view are two recent district court cases,

*Usery v. Whirlpool,* 416 F.Supp. 30 (N.D. Ohio, filed June 21, 1976), and *Dunlop v. Daniel Construction Company,* 4 OSHC 1125 (N.D.Ga., filed December 5, 1975). This Court must therefore determine whether to follow the rationale and holdings of these prior decisions in invalidating the Secretary's interpretative rule.

### B.

Where Congress has empowered an agency to promulgate rules and regulations "necessary to carry out [its] responsibilities" under a statutory enforcement scheme such as OSHA, interpretative regulations duly promulgated are entitled to great deference by the courts. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Only such regulations as are clearly inconsistent with the statute can be voided. Thus, the Supreme Court in *Manhattan G. E. Co. v. Commissioner of Internal Revenue,* 297 U.S. 129, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936) stated:

"The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law— for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute is a mere nullity . . . ."

Consequently when a court must determine whether a regulation is valid, it must look to the literal wording of the Act,[3] the purpose of the Act and the intention of the drafters when it can be found in pertinent legislative history.

---

**3.** The Act does not explicitly include a right to refuse dangerous work assignments. It does, however, give employees certain unspecified rights under § 11(c) and it is acknowledged that the employer is charged with a correlative duty under 29 U.S.C. § 654(a) to:

   (1) furnish to each of his employees employment and a place of employment which

are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

   (2) comply with occupational safety and health standards promulgated under this chapter.

It is upon these implied rights of the employee that the Secretary's interpretative rule is based.

The purpose of the Act, as stated in pertinent part in 29 U.S.C. § 651(b) is:

> "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources—(1) by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions; (2) by providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions; . . . ."

The Secretary's regulation, which would permit a worker to refuse a work assignment rather than subject himself to extremely dangerous work conditions is not clearly inconsistent with those purposes. Nor does it undercut the normal enforcement channels, for it may only be invoked when the situation is so urgent that regular enforcement procedures are not yet capable of remedying the situation.[4]

The defendant's primary contention, as noted above, is that the regulation in question has been challenged in two previous cases and invalidated on the basis of the Congressional history of the OSHA legislation. The defendant relies on *Usery v. Whirlpool, supra,* and to a lesser degree, on *Dunlop v. Daniel Construction Co., supra,* which in turn relied on certain excerpts of legislative history for the proposition that "the Congress squarely faced the issue as to whether or not employees should be permitted to leave the job when faced with a dangerous situation and decided that they should not." *Usery v. Whirlpool, supra* at 33.

In arriving at this conclusion, the court in *Whirlpool* primarily relied on the deletion of a provision in the committee bill which "would allow employees to absent themselves from a dangerous situation without loss of pay. 116 Cong.Rec. 38,369, 38,377–78 (1970)." *Id.* The court then emphasized a statement by the bill's sponsor discussing proposed amendments to his own bill:

> "The provision on employees not losing pay was so generally misunderstood that we have decided to drop it. We have no provision for payment of employees who want to absent themselves from risk of harm; instead, we have this amendment which enables employees subject to a risk of harm to get the Secretary into the situation quickly. Instead of making provisions for employees when their employer is not providing a safe workplace we have strengthened the enforcement by this amendment provision to try and minimize the amount that employees will be subject to risk of harm." 116 Cong.Rec. 38,377–78.

Read alone, this statement would appear to offer some support for the defendant's contention. But read in context with all of the other statements made during the floor debates, a different story unfolds. It is apparent that many legislators were troubled by the prospective ability of workers to, in effect, "strike with pay" under such a provision[5] and the bill's sponsor offered an amendment deleting this provision to placate groups of legislators. Read in the context of the entire debate it is apparent that Congress' voiced concern was aimed specifically against strike with pay. No mention was made of worker's right to absent themselves from a dangerous work situation without pay.

This Court cannot conclude that because Congress considered and rejected a "strike

---

**4.** As the Court understands the rule, it is applicable only if the employee has begun the procedure to notify the Secretary, and it remains applicable only until a compliance officer can come out to make a determination.

**5.** For example, Congressman Michel stated his objections in this manner:

> "If H.R. 16785 passes as is, it will add more fuel to the fire in an already turbulent labor forum. Unions could, and would use [the bill] to disregard the no-strike provisions in collective bargaining agreements. Further, even if union officers were against a local strike, 'red hot' rank and file members could and would disregard their 'contractual pledge.'" 116 Cong.Rec. 38,393 (1970).

with pay" provision that it thereby considered and rejected the right of an employee to refuse to work in an inherently dangerous environment. As the Secretary points out, "the concept of 'strike with pay' would have been a novel addition to the nations' labor-management policy." Even more tenuous is the defendant's suggestion that Congress, by its action described above, implicitly sanctioned the discharge of employees who refused to work in abnormally dangerous surroundings. Such an implication, would be completely contradictory to the purpose of OSHA.

Nor does the Court believe a similar conclusion could be drawn from the fact that Congress deleted the provision allowing an OSHA inspector to shut down a plant for 72 hours if he found that an imminent danger existed. See 116 Cong.Rec. 38,369 (1970). The legislative history is replete with voiced opposition to such a provision because of constitutional due process problems and equitable considerations involved in shutting down an entire plant or industry and the resulting damage to industry by such an action. As the Secretary notes,

> "The dichotomy of the options for dealing with imminent dangerous situations was not between allowing employees to walk off their jobs versus requiring the Secretary to seek a temporary restraining order . . . The actual dichotomy was between allowing the Secretary to *administratively order the closing* of an employment operation versus requiring the Secretary to seek a TRO (temporary restraining order) . . . " Plaintiff's brief, p. 12.

There is a vast amount of difference between shutting down an entire plant and allowing a few employees to refuse a particular work assignment.[6] The legitimate concerns that manifested themselves in the hearings and debates over the former action were not directed toward the latter. It is far from clear that deletion of the provision allowing for an administrative 72-hour

shutdown also precludes the refusal of an employee to work in a situation in which he is endangered.

While legislative history can be useful in interpreting the intent behind a statute, the courts must be wary of concentrating attention on fragments of discussion between debating factions. See *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Having reviewed the legislative history offered by the defendant (most of which is cited in *Whirlpool*) in the full context of the floor debates, this Court concludes that at worst it is ambiguous, at best consistent with the Secretary's interpretation in Rule 1977.-12(b)(2). As the Supreme Court stated in *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):

> "When faced with a problem of statutory construction, this Court shows great deference to the interpretations given the statute by officers of the agency charged with its administration. 'To sustain the Commission's application of the statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'"

The Secretary's interpretation of the Act in the light of the legislative history cannot be dismissed as an unreasonable interpretation and accordingly it must stand.

## C.

The practical necessity for such a rule is also quite persuasive. First the rule accords such relief (i. e., the right to refuse a work assignment) only in very limited circumstances, and only after the employee complies with certain conditions (i. e., notifying his employer of the potential danger, requesting that it be remedied and having received a refusal).

Second, despite Congressional hope that employers would voluntarily correct such

---

**6.** It is readily apparent that the rule is primarily directed at individual action, not group refusal. The right of collective refusal already existed.

*See* 29 U.S.C. § 143. The defendant does not contend that that section was repealed by implication by OSHA.

conditions,[7] and despite the procedures for obtaining temporary injunctive relief,[8] it is clear that some relief must be accorded to employees during the period before statutory enforcement proceedings can be implemented. Under the enforcement provisions of OSHA, imminent danger proceedings are initiated by the Secretary after receiving a written request for an inspection of an alleged dangerous work condition. If the Secretary determines there is merit to the request, he conducts an on-site inspection.[9] If he then determines there exists an imminent danger situation, he may seek a temporary restraining order from a federal court. As the Secretary points out, this procedure cannot be completed in a matter of minutes nor rarely in a matter of hours.

In the meantime the complaining employee is confronted with the Hobson's choice of accepting the work assignment and risking death or serious bodily injury [10] (and possibly sanctions from the OSHA compliance officer [11]) or refusing to do that particular work and being permanently discharged. Such draconian alternatives are simply not consistent with the policy of the Act in encouraging the reporting and correcting of safety violations. Rather it operates as a loophole through which employers can avoid or short-circuit regular statutory enforcement.

For these reasons the Court holds that the Secretary's rule must be upheld and the defendant's motion for partial summary judgment is accordingly denied.

IT IS SO ORDERED.

7.  At least several Congressmen expressed their feeling that if employees informed their employers of an apparent hazardous working condition, then "99 times out of 100" the employer would correct it. *See* 116 Cong.Rec. 38,367–386 and 116 Cong.Rec. 37,327–346 and 37,621–629 (1970).

8.  *See* 29 U.S.C. § 662 (1970).

9.  The Secretary, of course, is limited in his manpower to enforce OSHA and must review all such requests to ensue the best utilization of his compliance officers. The Secretary's decision can only be challenged (by writ of manda-

mus) if he arbitrarily or capriciously fails to seek relief under the section. 29 U.S.C. § 662(d).

10.  In *Whirlpool, supra,* two weeks prior to the refusal of those employees to engage in what they believed was hazardous work, another employee who attempted to perform the same work died because of the hazardous situation.

11.  Mr. Dedman could arguably have been subject to sanctions for performing this work under 29 CFR § 1910.179(n)(3)(vi) and 1926.-550(d)(4).