F. Ray MARSHALL, Secretary of Labor, United States Department of Labor, Appellant,

v.

DANIEL CONSTRUCTION COMPANY, INC., Defendant-Appellee.

No. 76–1465.

United States Court of Appeals, Fifth Circuit.

Nov. 21, 1977.

Rehearing and Rehearing En Banc Denied Dec. 30, 1977.

William J. Kilberg, Sol. of Labor, U. S. Dept. of Labor, Michael H. Levin, Counsel for Appellate Litigation, Dept. of Labor, Dennis K. Kade, Benjamin W. Mintz, Associate Sols. for Occupational Safety and Health, Washington, D. C., for appellant.

Robert M. Weinberg, George H. Cohen, Washington, D. C., for Industrial Union Dept. of AFL–CIO, amicus curiae.

Homer L. Deakins, Jr., Gregory B. Tobin, Robert T. Thompson, John P. Campbell, Atlanta, Ga., for defendant-appellee.

Before WISDOM, CLARK and RONEY, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Pursuant to 29 U.S.C. § 660(c)(2)[1] of the Occupational Safety and Health Act of 1970, *id.* §§ 651 *et seq.*, the United States Secretary of Labor (Secretary) filed a complaint in the district court alleging that defendant, Daniel Construction Company (Daniel), had discharged one of its employees, Jimmy D. Simpson, for refusing to perform a task "under conditions which reasonably caused him to conclude that there was a real and immediate danger of death or serious injury to him if he performed his assigned work,"[2] and that, since Simpson's refusal to work under these conditions was protected by 29 C.F.R. § 1977.12 (1976),[3] Daniel violated 29 U.S.C. § 660(c)(1)[4] which proscribes an employer's discharge of any of

---

1. 29 U.S.C. § 660(c)(2) provides:

    Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of [29 U.S.C. § 660(c)(1)] may, within thirty days after such violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall cause such investigation to be made as he deems appropriate. If upon such investigation, the Secretary determines that the provisions of [29 U.S.C. § 660(c)(1)] have been violated, he shall bring an action in any appropriate United States district court against such person. In any such action the United States district courts shall have jurisdiction, for cause shown to restrain violations of [29 U.S.C. § 660(c)(1)] and order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay.

2. The precise facts of the occurrence were not before the district court, and we decline to consider them for the first time here.

3. 29 C.F.R. § 1977.12 (1976) provides:

    (a) In addition to protecting employees who file complaints, institute proceedings, or testify in proceedings under or related to the Act, section 11(c) also protects employees from discrimination occurring because of the exercise "of any right afforded by this Act." Certain rights are explicitly provided in the Act; for example, there is a right to participate as a party in enforcement proceedings (sec. 10). Certain other rights exist by necessary implication. For example, employees may request information from the Occupational Safety and Health Administration; such requests would constitute the exercise of a right afforded by the Act. Likewise, employees interviewed by agents of the Secretary in the course of inspections or investigations could not subsequently be discriminated against because of their cooperation.

    (b)(1) On the other hand, review of the Act and examination of the legislative history discloses that, as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace. Hazardous conditions which may be violative of the Act will ordinarily be corrected by the employer, once brought to his attention. If corrections are not accomplished, or if there is dispute about the existence of a hazard, the employee will normally have opportunity to request inspection of the workplace pursuant to section 8(f) of the Act, or to seek the assistance of other public agencies which have responsibility in the field of safety and health. Under such circumstances, therefore, an employer would not ordinarily be in violation of section 11(c) by taking action to discipline an employee for refusing to perform normal job activities because of alleged safety or health hazards.

    (2) However, occasions might arise when an employee is confronted with a choice between not performing assigned tasks or subjecting himself to serious injury or death arising from a hazardous condition at the workplace. If the employee, with no reasonable alternative, refuses in good faith to expose himself to the dangerous condition, he would be protected against subsequent discrimination. The condition causing the employee's apprehension of death or injury must be of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a real danger of death or serious injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels. In addition, in such circumstances, the employee, where possible, must also have sought from his employer, and been unable to obtain, a correction of the dangerous condition.

4. 29 U.S.C. § 660(c)(1) provides:

    No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [OSHA] or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by [OSHA].

its employees for exercising any right afforded under OSHA. The district court found that OSHA provided no legal basis for the Secretary's interpretation of 29 U.S.C. § 660(c)(1) as protecting an employee's refusal to work in the face of hazardous conditions and dismissed the complaint under Federal Rule Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. The Secretary's appeal timely followed. We affirm.

Congress adopted the Occupational Safety and Health Act of 1970 (OSHA) "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and preserve our human resources" in any business affecting interstate commerce. 29 U.S.C. § 651(b). To this end, the Secretary is authorized to promulgate permanent and, in limited instances, emergency safety and health standards (standards) applicable to the workplace, id. § 655; see *Florida Peach Growers Ass'n v. United States Department of Labor*, 489 F.2d 120, 123–24 (5th Cir. 1974), and to enforce those standards in appropriate proceedings. *Id.* §§ 657–660(a), (b); see *Atlas Roofing Co. v. OSHRC*, 518 F.2d 990, 995–1000 (5th Cir. 1974), *aff'd*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). Employers and employees are charged with "separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions . . ." 29 U.S.C. § 651(b)(2). For example, employers have affirmative duties to furnish their employees with "employment and a place of employment . . . free from recognized hazards . . . causing or are likely to cause death or serious physical harm" and to comply with standards promulgated under the Act. *Id.* § 654(a); see *Ace Sheeting & Repair Co. v. OSHRC*, (5th Cir. 1977) 555 F.2d 439. Employees are responsible for complying with the Secretary's standards and "all rules, regulations, and orders issued [under OSHA] which are applicable to [their] own actions and conduct." *Id.* § 654(b). The Act also affords numerous rights to employees, among which are the rights to request inspections of the workplace and to seek mandamus relief against the Secretary when he arbitrarily fails to request injunctive relief to abate dangerous conditions.[5] To ensure that employees will not be intimidated or deterred from exercising their express rights, *id.* § 660(c)(1) provides that employees may file a complaint with the Secretary alleging that their employer has discharged or otherwise discriminated against them for exercising any right afforded under the Act.

The Secretary has interpreted section 660(c)(1) to protect employees in the exercise of rights that exist by necessary implication as well as those rights that are expressly afforded under OSHA. 29 C.F.R. § 1977.12(a) (1976). As a means of implementing this interpretation, the Secretary has determined that OSHA implicitly affords employees the right to refuse to work "under . . . circumstances then confronting the employee [at the workplace which] would [cause him to] conclude that there is a real danger of death or serious injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels." *Id.* § 1977.12(b)(2) (1976); see note 3 *supra*. Our task in the instant case is to determine the validity of this regulation.

The district court dismissed the Secretary's complaint under Federal Rule Civil Procedure 12(b)(6). We review this appeal under the "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *followed, e. g., Robinson v. Price*, 553 F.2d 918, 919 (5th Cir. 1977).

The Secretary issued regulation 1977.12(b) pursuant to his grant of authority to "prescribe such rules and regulations as he may deem necessary to carry out [his]

---

5. *Id.* §§ 657(f)(1), 662(d).

responsibilities under [the Act] . . . ." 29 U.S.C. § 657(g)(2). The validity of the Secretary's regulations "will be sustained so long as [they are] 'reasonably related to the purposes of the enabling legislation'. . ." *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). Moreover, as the Secretary's interpretation of OSHA's requirements is entitled to "great weight," *Brennan v. Southern Contractors Service*, 492 F.2d 498, 501 (5th Cir. 1974), Daniel has the burden of proving that the Secretary's regulation is inconsistent with his congressional grant of authority. *See, e. g., Springdale Convalescent Center v. Mathews*, 545 F.2d 943, 951 (5th Cir. 1977). Nonetheless, our examination of the statutory scheme and the legislative history of the Act compels the conclusion that Daniel has satisfied its burden and that the regulation is invalid because it is beyond the Secretary's grant of authority under the enabling provision.

### A. The Statutory Rights of Workers When Confronted With Imminent Dangers

29 U.S.C. § 657(f)(1) entitles workers who believe that an "imminent danger" exists at the workplace to notify the Secretary of the danger.[6] If the Secretary determines an inspection is unnecessary, he must notify the worker of his decision. If the Secretary is satisfied, however, that the notice provides him with reasonable grounds to believe that an imminent danger exists, an OSHA inspector may enter the workplace to inspect and investigate the premises, "all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials . . . and . . . question privately any such employer, owner, operator, agent or operator." *Id.* § 657(a). If, upon inspection and investigation, the OSHA inspector believes that the employer has violated the Act, he must issue the employer a citation, notifying him that the unlawful condition or practice must be abated within a prescribed time. The citation must be prominently posted at or near the place of the violation within six months of the alleged violation in order to apprise employees of the offense. *Id.* § 658.

If the OSHA inspector believes, however, that practices or conditions exist in the workplace which present a danger of death or serious physical harm immediately or before the danger can be eliminated through other enforcement procedures, the OSHA inspector must recommend to the Secretary that immediate injunctive relief against the dangerous practices or conditions be sought. *Id.* § 662(a), (b), (c).[7] The inspector must notify employees at the affected workplace that he believes such conditions exist and that he is requesting in-

---

**6.** 29 U.S.C. § 652, which sets forth Congress's definitions of principal words and phrases in the Act, does not provide a definition of "imminent danger." Under 29 U.S.C. § 662(a), the Secretary has the authority to enjoin "any conditions or practices in any place of employment which are such that a danger exists which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures otherwise provided by [the Act]." The legislative history supports the conclusion that this is to serve as Congress's definition of the phrase "imminent danger." *E. g.,* S.Rep.No. 1282, 91st Cong., 2d Sess. 12, 35 [hereinafter cited as S.Rep.], *reprinted in* Subcommittee on Labor of Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970, at 152, 175 (Comm. Print 1971) [herein-

after cited as Legislative History], *and reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 5177, 5189, 5212 [hereinafter cited as 1970 U.S.Admin.News].

**7.** District courts are authorized to enter injunctive orders that require any necessary relief to avoid, correct, or remove such imminent danger and prohibit the employment or presence of any individual in locations or under conditions where such imminent danger exists, except individuals whose presence is necessary to avoid, correct, or remove such imminent danger or to maintain the capacity of a continuous process operation to resume normal operations without a complete cessation of operations, or where a cessation of operations is necessary, to permit such to be accomplished in a safe and orderly manner. 29 U.S.C. § 662(a).

junctive relief. *Id.* § 662(c). Employees are entitled to petition the federal district court for a writ of mandamus against the Secretary if he arbitrarily or capriciously fails to seek the injunctive relief requested by the OSHA inspector. *Id.* § 662(d).

Congress's apparent purpose in granting workers the right to request inspections for imminent dangers is to enable them to be adjuncts to OSHA inspectors who have primary responsibility for conducting OSHA compliance inspections at the employer's premises. This may also be inferred from the fact that *id.* § 657(c) provides that an authorized employee representative is entitled to accompany the OSHA inspector when conducting a physical inspection of the worksite and that, in the absence of such a representative, the OSHA inspector must consult employees present about safety and health matters for the purpose of aiding the inspection. A worker's exercise of these rights facilitates on-site inspections and thus aids the enforcement efforts of OSHA's inspection forces. It also assures a greater degree of involvement on their part in the investigation process and serves to make them more conscious of safety and health conditions and practices in the workplace.[8]

While Congress envisioned that workers play an integral role in achieving the salutary purpose of assuring safe and healthful working conditions, in relation to preventing imminent dangers, OSHA expressly provides the contours of the part that workers play: (1) They may notify the Secretary of those conditions and practices that they *believe* present an imminent danger and request an immediate inspection, and (2) they may provide the inspector with information during the investigation. Before an imminent danger is enjoined, however, four independent judgments must be integrated in the decision-making calculus: (1) The Secretary must conclude that the worker's notice provides reasonable grounds to believe that an imminent danger exists. (2)

An OSHA inspector must conclude upon inspecting the workplace that the danger cannot be prevented through normal enforcement procedures but requires immediate injunctive relief and recommend to the Secretary that he seek relief. (3) The Secretary must conclude that the inspector is correct and proceed to federal court. (4) A federal district court must find that an imminent danger exists at the worksite such that requires immediate injunctive relief. At no point does the Act permit workers to make a determination that a dangerous condition exists *in fact* and that their employment or their employer's business operations may be halted by their refusal to work. Indeed the Secretary, in promulgating regulation 1977.12(b), has acknowledged this with the following language: "[R]eview of the Act and examination of the legislative history discloses that, as a general matter, there is no right afforded by the Act which would entitle employees to walk off the job because of potential unsafe conditions at the workplace." 29 C.F.R. § 1977.12(b)(1) (1976). We now consider the Secretary's arguments that the existence of this right may be implied from the Act, its legislative history, and analogous case law.

### B. An Implied Right of Workers to Refuse to Work When Confronted With Dangerous Conditions

Pointing to the Act's legislative history, the Secretary asserts that it reflects that (1) Congress desired to enlist employees as private compliance officers as a means of policing the millions of worksites covered by the Act; (2) informal employer-employee communications provide the most efficacious means of abating unsafe conditions; (3) since workers are often in the best position to discover and identify hazardous practices and conditions, open communications between employees, their employers, and the Secretary are crucial to implementing the enforcement goals of the Act. We agree with the Secretary that in adopting

---

8. S.Rep. 11 *reprinted in* Legislative History 151 *and reprinted in* 1970 U.S.Admin.News, pp. 5187–88.

OSHA, Congress granted employees a new set of important rights and sought that they play a vital role in achieving safe and healthful conditions at the workplace.

█ Two principal series of events which occurred during Congress's consideration of the Act cause us to conclude that Congress did not intend that OSHA grant workers a right to walk off the job when faced with what they believe to be a dangerous work condition.

Representative Daniels of New Jersey sponsored one of several bills dealing with safe and healthful working conditions that the House of Representatives considered during 1969 and 1970.[9] The Daniels Bill, which was reported to the house by the Committee on Education and Labor, contained a subsection which entitled employees to absent themselves from the job with pay when exposed to substances which had a potentially toxic or harmful effect when found or used at certain levels in the workplace, unless their employer provided appropriate warning labels and protective equipment which allowed them to carry out their work without being harmed.[10] Opponents to the Daniels Bill quickly labeled this subsection as guaranteeing workers the right to "strike with pay," a label which proved to be its epitaph. Two months after the Daniels Bill was reported out of committee, Representative Steiger of Wisconsin, an Education and Labor Committee member who had opposed the Daniels Bill, introduced a substitute bill on the floor of the House which did not contain a "strike with pay"

provision. In an effort to make his bill more attractive to House members, Representative Daniels ultimately offered a set of floor amendments to his own committee-approved bill which, among other things, deleted its "strike with pay" provisions and gave employees the right to request that the Secretary immediately inspect the premises. His explanation to the House for the amendment with its proposed substitutions is revealing:

> The provisions on employees not losing pay was so generally misunderstood that we have decided to drop it. We have no provision for payment of employees who want to absent themselves from risk of harm; instead, we have this amendment which enables employees subject to a risk of harm to get the Secretary into the situation quickly. Instead of making provisions for employees when their employer is not providing a safe workplace, we have strengthened the enforcement by this amendment provision to try and minimize the amount that employees will be subject to the risk of harm.

116 Cong.Rec. 38377–78 (1970), *reprinted in* Legislative History 1009. The Steiger Bill did not give employees the right to request an immediate inspection of the workplace. In choosing between the two bills, the House ultimately adopted the Steiger Bill.[11] The occupational safety and health bill ultimately adopted by the Senate permitted workers to request that the Secretary inspect the employer's premises when they believed that a condition or practice was present which created an imminent dan-

---

9. During these 2 years, a total of six occupational safety and health bills were introduced in the House. H.Rs. 843, 3809, 4294, 13373, 91st Cong., 1st Sess. (1969); H.Rs. 16785, 19200, 91st Cong., 2d Sess. (1970), *reprinted in* Legislative History 599, 629, 659, 679, 721, 763. Of these, two received the principal attention of Congress: H.R. 16785 (Daniels Bill), which was supported by organized labor, and H.R. 19200 (Steiger Bill), which was supported mainly by Republicans. *See generally* Gross, *The Occupational Safety & Health Act: Much Ado About Something*, 3 Loy.Chi.L.J. 247, 249–51 (1972).

10. H.R. 16785, 91st Cong., 2d Sess., § 19(a)(5) (1970), *reprinted in* Legislative History 755–56. The committee's accompanying report provides an explanation for the provisions. H.R.No. 1291, 91st Cong., 2d Sess. 29–30 (1970), *reprinted in* Legislative History 859–60.

11. 116 Cong.Rec. 38715, (teller vote), 38723–24 (roll call votes), (1970), *reprinted in* Legislative History 1091, 112–15. When the House adopted the Steiger Bill, the "strike with pay" provision had been deleted from the Daniels Bill. 116 Cong.Rec. 38715 (1970), *reprinted in* Legislative History 1091–92.

ger.[12] The extent of notoriety which the "strike with pay" provision gained is evidenced by the statement of Senator Williams of New Jersey when introducing to the Senate his occupational safety and health bill[13] after it had been reported out of committee. In apprising his fellow solons that his bill did not contain a "strike with pay" provision, Senator Williams remarked:

> I should also add, despite some widespread contentions to the contrary, that the committee bill does not contain a so-called strike-with-pay provision. Rather than raising a possibility for endless disputes over whether employees were entitled to walk off the job with full pay, it was decided in committee to enhance the prospects of compliance by the employer through such means as giving the employees the right to request a special Labor Department investigation or inspection.

119 Cong.Rec. 37326 (1970), *reprinted in* Legislative History 416. Clearly, the Senate committee intended that workers be given the right to request inspections of the employer's premises in lieu of a provision entitling them to leave the premises with pay. When the Steiger Bill and the Williams Bill were submitted to the conference committee, the House acceded to this provision in the Williams Bill.[14]

The second principal series of events involves the legislative evolution of the Act's "imminent danger" section, 29 U.S.C. § 662, the provisions of which were discussed above. As originally reported out of committee, the Daniels Bill permitted OSHA inspectors to issue administrative orders which "prohibit[ed] the employment or presence of any individuals on locations or under conditions where . . . an imminent danger exists, except to correct or remove it" but which could not remain in effect for more than five days. A United States district court in an action by the Secretary was given the authority to enjoin business operations for greater lengths of time.[15] The Steiger Bill vested authority only in the courts, upon petition of the Secretary, to enjoin imminent dangers at the workplace.[16] As a response to the Steiger Bill, Representative Daniels amended the imminent danger section of his bill so that only the courts had the authority to enjoin an employer's business operations.[17]

---

**12.** S. 291, 91st Cong., 2d Sess., § 8(f)(1) (1970), *reprinted in* Legislative History 529, 550.

**13.** S. 2193, 91st Cong., 1st Sess. (1960), *reprinted in* Legislative History 1. An amended version of the Williams Bill was reported out of the Senate Committee on Labor and Public Welfare, S. 2193, 91st Cong., 2d Sess. (1970), *reprinted in* Legislative History 204, with an accompanying committee report. S.Rep.No. 1282, *reprinted in* Legislative History 141 *and reprinted* in 1970 U.S.Admin.News, p. 5177.

**14.** H.R.No. 1765, 91st Cong., 2d Sess. 37 (1970), *reprinted in* Legislative History 1190, *and reprinted in* 1970 U.S.Admin.News, p. 5234.

**15.** H.R. 16785, 91st Cong., 2d Sess., § 12(a) (1970), *reprinted in* Legislative History 893, 955–56. The committee's accompanying report provides an explanation for this provision. H.R.No. 1291, 91st Cong., 2d Sess., 25 (1970), *reprinted in* Legislative History 855. Several minority members, however, expressed their dissatisfaction with this provision.

**16.** H.R. 19200, 91st Cong., 2d Sess., § 12 (1970), *reprinted in* Legislative History 796–98.

**17.** When proposing his amendments to the House, Representative Daniels offered the following explanation for permitting only the United States district courts to enjoin an employer's business:

> While administrative shutdown provisions are contained in the laws of 36 States and the District of Columbia, business groups have expressed great fears about the potential for abuse. They believe that the power to shut down a plant should not be vested in an inspector.
> While there is no documentation for this fear, we recognize that it is very prevalent. The Courts have shown their capacity to respond quickly in emergency situations, and we believe that the availability of temporary restraining orders will be sufficient to deal with emergency situations. Under the Federal rules of civil procedure, these orders can be used ex parte. If the Secretary uses the authority that he is given efficiently and expeditiously, he should be able to get a court order within a matter of minutes rather than hours.

*Id.* 38378, *reprinted in* Legislative History 1009–10.

The Williams Bill contained an imminent danger provision, however, which authorized an OSHA inspector, upon receiving the concurrence of an appropriate regional Labor Department official, to issue an administrative order restraining an employer's business operations for a period up to 72 hours. This authority was to be exercised only when the Secretary had insufficient time to seek and obtain a court-ordered injunction, and the Secretary was required to provide appropriate review procedures to permit employers to obtain immediate reconsideration of an inspector's administrative order.[18] When the Williams Bill and the Steiger Bill were submitted to conference committee, the Senate receded from its provision permitting OSHA inspectors to issue 72-hour administrative orders.[19]

"Instead of balancing the various generalized axioms of experience in construing legislation, regard for the specific history of the legislative process that culminated in the Act now before us affords more solid ground for giving it appropriate meaning." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222, 73 S.Ct. 227, 230, 97 L.Ed. 260 (1952); *see Southern Pacific Transportation Co. v. Usery*, 539 F.2d 386, 391 (5th Cir. 1976).

Both chambers of Congress considered specific provisions designed to afford workers certain rights or no rights whatsoever when confronted with conditions or practices presenting an imminent danger of death or physical injury to workers. While the so-called "strike with pay" provision of the Daniels Bill literally applied to conditions dangerous to health rather than conditions dangerous to safety, the wholesale rejection of the provision demonstrates that an overriding concern of Congress was its fear that workers might abuse the rights

granted and disrupt or terminate their employer's business operations as a form of intimidation or harassment. Apparently believing that workers might also attempt unduly to influence OSHA inspectors if these officials were given the authority to issue administrative orders restraining an employer's business operations, Congress gave the federal courts the sole authority to enjoin, upon the Secretary's petition, an employer's business and then only to the extent necessary to eradicate the imminent danger.

In lieu of providing workers with the right to "strike with pay," the Senate committee approved legislation providing employees with the right to request that the Secretary immediately inspect the employer's premises when they believed that an imminent danger exists at the workplace. In ultimately granting workers this right to request inspections, Congress adopted a procedure that permitted workers to participate in the enforcement efforts under the Act. Yet at the same time in providing a statutory scheme requiring four independent evaluations of the existence *vel non* of the allegedly dangerous condition prior to permitting a court to enjoin an employer's business operations, it created a procedure that would prevent the potential for abuse from the worker's indiscriminate exercise of his right and avoid unnecessary confrontations between employer and employees which might cause a disruption of the employer's business operations.

The Secretary's regulation before the court today is designed to achieve an end consistent with the purposes of the Act. Yet it expressly confers upon employees a right that Congress deliberately chose not to grant to OSHA inspectors: the right to determine *in fact* that an employment prac-

---

**18.** S. 2193, 91st Cong., 2d Sess., § 12 (1970), *reprinted in* Legislative History 561–64. The Senate committee's accompanying report provides an explanation of this procedure. S.Rep. 12–13, *reprinted in* Legislative History 152–53, *and reprinted in* 1970 U.S.Admin.News, pp. 5189–90. In expressing his views on the Williams Bill, Senator Javits of New York was careful to note the distinction between the im-

minent danger provision of the Williams Bill and the one contained in the Daniels Bill. *Id.* 56–57, *reprinted in* Legislative History 195–96, *and reprinted in* 1970 U.S.Admin.News, p. 5221.

**19.** H.R.No. 1765, 91st Cong., 2d Sess. 40 (1970), *reprinted in* Legislative History 1193, *and reprinted in* 1970 U.S.Admin.News, p. 5236.

tice or condition presents "a real danger of death or physical injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory procedures." 29 C.F.R. § 1977.12(b)(2) (1976). Moreover, by permitting employees to refuse work upon making such a determination, the regulation provides them authority equivalent to that of an OSHA inspector when issuing an administrative stop work order—a right which Congress also deliberately withheld from OSHA inspectors.[20] A worker's abuse of the authority afforded under the regulation could disrupt or cripple an employer's business. The legislative history is manifest that Congress feared such a result. We hold that the regulation exceeds the Secretary's scope of authority to promulgate regulations as granted under the Act.

Citing similar anti-employee discrimination provisions in other remedial labor legislation and decisions construing those provisions as protecting a broad penumbra of protected employee activities, the Secretary argues that 29 U.S.C. § 660(c)(1), which protects employees in their exercise of any right afforded by the Act, necessarily encompasses the right of employees to refuse to work in the face of hazardous conditions.

The Secretary's use of these decisions as support for its position here is misplaced. For example, the Secretary relies upon *Phillips v. Interior Board of Mine Operations Appeals,* 163 U.S.App.D.C. 104, 500 F.2d 772 (1974), *cert. denied,* 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975), a case arising under the Coal Mine Safety and Health Act, 30 U.S.C. §§ 801 *et seq.* Section 820(b)(1) of this Act provides in part: "No person shall discharge or in any . . way discriminate against any miner [for having] . . . notified the [agency] . . . of any alleged violation or danger . . . filed, instituted, or . . . tes-

tified . . . in any proceeding . . .." In *Phillips* the United States Court of Appeals for the District of Columbia held that this provision prohibits an employer from discharging an employee who had notified his foreman or authorized safety committee man of possible safety violations in the employer's mine. The court found that the employee's activity was protected because it constituted the initial step in an internal review procedure agreed upon by the employer and the employee's representative for processing employee safety complaints under the Coal Mine and Safety Act. 163 U.S.App.D.C. at 111–113, 500 F.2d at 779–81. *See also Munsey v. Morton,* 165 U.S. App.D.C. 379, 507 F.2d 1202, 1209 (1974) (vacating and remanding decision of the Interior Board of Mine Operations Appeals order to determine whether *Phillips* applied).

The complaint in the instant case, however, contains no allegations that Daniel and its employees have established an internal procedure for the processing and review of employees' safety complaints or that Simpson attempted to make or made a complaint under an established review procedure and was discharged for doing so. The complaint alleges solely that Simpson was discharged for refusing to work in the face of hazardous conditions. This is not an employee activity protected under OSHA.

The Secretary also relies upon *NLRB v. Scrivener,* 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972). In *Scrivener* an employer had discharged several of its employees for giving written sworn statement to a NLRB field examiner who was investigating an unfair labor practice charge filed against the employer. 29 U.S.C. § 157(a)(4) of the National Labor Relations Act (NLRA) provides that an employer commits an unfair labor practice when he discharges

**20.** Judge Wisdom's dissent would permit the regulation on the theory that Congress meant to allow workers rather than federal employees the right to make safety determinations. He reasons that by impliedly shifting the power to close down a job to an employee rather than "a lone government inspector," due process problems with the latter solution would disappear.

While it is conceded the actor would become a private person, the protection Congress afforded to the employer arguably would diminish rather than increase. We respond by reiterating that if Congress was expressly unwilling for an OSHA inspector to decide job safety, then clearly they did not impliedly intend to entrust the shutdown power to a single employee.

or otherwise discriminates against an employee for filing charges or giving testimony under the NLRA. The United States Supreme Court interpreted this section as prohibiting the employer's discharge of his employees for their activity because such a construction comported with the sections' objective of providing the Board with sources of employee information essential to enforcing the NLRA. *Id.* at 122, 92 S.Ct. 801.

OSHA expressly permits employees to request that the Secretary make inspections when an imminent danger arises and to provide the OSHA inspector with information about the danger when the workplace is being investigated. The complaint contains no allegations that can be construed as encompassing this protected activity. For example, the complaint does not allege that Simpson was fired for temporarily absenting himself from his job so that he might request an OSHA inspection and give notice of the dangerous condition. Nor does it allege that Simpson was fired for attempting to make such a request.

When adopting OSHA, Congress deliberately sought to achieve job safety while maintaining proper employer-employee relations. Recognition of an employee's right to refuse to work in the face of hazardous conditions does not necessarily further the same informational purposes that the right to request inspections promotes. As we have already noted, the abuse of this right could disrupt or permanently damage an employer's business operation—a hazard that Congress refused to place within the ambit of the Act.[21] Here we are provided with "substantial countervailing considerations" which militate against the recognition of the right at issue, a factor the Supreme Court found wanting in *Scrivener*.

---

21. The dissent dramatically refuses to attribute to Congress an intent to place workers in the dilemma of losing job or life. We do not find that Congress ever perceived it faced making such a choice. They did answer the question of whether the employer or a government official would decide the work place was free of imminent danger by choosing to leave this judgment with the employer. The beneficent intent of the regulation is conceded. Its lack of founda-

*Id.* at 125, 92 S.Ct. 803. The decision of the district court is

AFFIRMED.

WISDOM, Circuit Judge, dissenting:

The Court today finds that the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 *et seq.*, requires a worker to choose between his job and risk of death. An interpretative regulation of the Secretary of Labor, 29 C.F.R. 1977.12(b), eliminates this hard choice. In my opinion, the regulation invalidated by the Court is reasonably related to the purposes of the Act. Because I cannot read the legislative history to forbid implicitly this regulation, I must respectfully dissent.

I.

The district court dismissed the complaint for failure to state a claim upon which relief could be granted. "In appraising the sufficiency of the complaint, we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 1957, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80. "This rule, which has been stated hundreds of times, precludes final dismissal for insufficiency of the complaint except in the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief." Wright, Federal Courts, ch. 10, § 68, p. 322 (1976). This case presents in pure form, therefore, a challenge to the Secretary of Labor's interpretative regulation, 29 C.F.R. 1977.12(b), on which the plaintiff relies.[1]

---

tion in the legislation it must implement is its undoing.

1. Three district courts, other than the court below, have passed on the validity of this regulation. *Usery v. Babcock & Wilcox*, E.D.Mich. 1976, 424 F.Supp. 753 (regulation upheld); *Usery v. Whirlpool Corporation*, N.D.Ohio, 1976, 416 F.Supp. 30, *appeals docketed*, Nos. 76–2143, 76–2144, 6 Cir., Sept. 7, 1976 (regulation held invalid); *Brennan v. Diamond Int'l*

For purpose of the motion to dismiss, we assume that the plaintiff would be able to prove the following set of facts which are within the ambit of the facts alleged in the complaint. Daniel Construction Company employed Jimmy Simpson as an ironworker connecting structural steel in the construction of tall buildings. The job required fitting into place heavy steel beams with the aid of a crane. One windy day Simpson was working 150 feet above the ground. The wind grew so strong that it imperiled his life. He came down from high on the steel skeleton where he had been working. So did the rest of his crew. A foreman ordered the crew to return to work. Simpson refused. He was fired.

The importance of the majority's holding extends far beyond this case. The effect of the holding is to force an anti-social dilemma on workers who face imminent danger of a hazard then and there occurring and have no immediate relief available but to refuse to continue working in an unsafe place. The procedures which the statute expressly provided to correct unsafe conditions cannot come to the worker's rescue in time when he is exposed to immediate danger to life or limb.

The regulation in question provides:

"(2) However, occasions might arise when an employee is confronted with a choice between not performing assigned tasks or subjecting himself to serious injury or death arising from a hazardous condition at the workplace. If the employee, with no reasonable alternative, refuses in good faith to expose himself to the dangerous condition, he would be protected against subsequent discrimination. The condition causing the employee's apprehension of death or injury must be of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a real danger of death or serious injury and that there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory enforcement channels. In addition, in such circumstances, the employee, where possible, must also have sought from his employer, and been unable to obtain, a correction of the dangerous condition." [2]

The majority recognizes a properly deferential standard for our review of the Secretary's interpretation of the Act. However, it does not seem to apply the spirit of the Supreme Court's injunction that to sustain such an interpretation, "we need not find that [his] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings". *Udall v. Tallman*, 1965, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625, *quoting Unemployment Comm'n v. Aragan*, 1946, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136, 145. *See Brennan v. Southern Contractors Service*, 5 Cir. 1974, 492 F.2d 498, 501.

## II.

This regulation is reasonably related to the purposes of the Act. The Act begins with this statement of purpose.

"The Congress declares it to be its purpose and policy . . . to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." [3]

Section 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1), provides the specific foundation for these regulations.

"No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act or has testified or is about to testify in any such proceeding or because

---

*Corp., Heekin Can Div.*, S.D.Ohio, June 8, 1976, C.A.No. C–1–75–43, *appeal dismissed*, No. 76–2139, 6 Cir., April 1977 (regulation held invalid).

**2.** 29 C.F.R. § 1977.12(b) (1976). This regulation was adopted as an interpretation of the Act. *See* 29 C.F.R. § 1977.2 (1976).

**3.** 29 U.S.C. § 651(b) (1970).

of the exercise by such employee on behalf of himself or others of any right afforded by this Act."

Following his mandate to protect the American worker, the Secretary has filled a dangerous gap in the Act. As the majority points out, the Act allows a worker to make a written request for immediate federal inspection whenever the worker believes himself to be in imminent danger. The Secretary must determine whether such an inspection is warranted. If he finds it is not, he must notify the complaining parties in writing. If he finds that it is, he must order an investigation as soon as practicable. The inspector then must determine whether imminent danger exists. If he finds that it does, he is required to inform the Secretary, who may bring an action in federal district court for an injunction. The employee may use a writ of mandamus, or its equivalent,[4] to force the Secretary to act properly. While these events take place, the worker, presumably in imminent danger, has no relief according to the majority. In this case Jimmy Simpson would be required to stay on the high skeleton, handling heavy steel and attempting to balance himself, no matter how strong the winds became, or lose his job—until the district court issued an injunction. A literal reading of the statute in this situation may make its remedies tragically late.

Regulation 1977.12(b) was promulgated to fill this gap. If the employee reasonably believes that he is in imminent danger of death or serious bodily harm *and* believes the procedures outlined above inadequate to prevent that danger, he may withdraw from work without penalty. This gives the employee an essential interim protection while the statutory remedies are being followed. This protection is limited. The government cannot order the employer to make any changes, and, apparently, the worker is neither entitled to receive pay while not working, nor privileged to refuse alternative, safe work. He merely wins freedom from exposure to danger.

There are two different ways to justify this interpretation of section 11(c)(1). First, the regulation can be interpreted as embodying one of the "other rights" mentioned in 11(c)(1), a right to safe conditions implicit in the entire law.

Second, the regulation can be seen as an essential part of the employee enforcement envisioned by Congress and protected by that section.[5] It both increases the incentive for the worker to use the Act's protective mechanism and it ensures that the reporting worker will be available during the inspection and any later proceedings. Similar provisions are contained in other labor legislation, including the National Labor Relations Act,[6] the Coal Mine Safety and Health Act,[7] and Title VII of the Civil

---

4. The Act provides specifically for a writ of mandamus, 29 U.S.C. § 662(d) (1970). The writ of mandamus, however, has been abolished in federal practice. F.R.Civ.P. 81(b). *See* Oldham, O.S.H.A. May Not Work in 'Imminent Danger' Cases, 60 A.B.A.J. 690 (1974).

5. Congress, aware of the shortage of federal and state occupational safety inspectors, placed great reliance on employee assistance in the enforcement of the Act. *See* S.Rep.No. 1282, 91st Cong., 2d Sess. 11–12, *reprinted in* Subcommittee on Labor of Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970, at 151–52 (Comm. Print 1971) [cited below as Legislative History], *and reprinted in* [1970] U.S.Code Cong. & Admin.News pp. 5177, 5188–89 [cited below as 1970 U.S.Admin.News]; H.Rep. No. 1291, 91st Cong., 2d Sess., 22, *reprinted in* Legislative History at 852; 116 Cong.Rec.

38386 (remarks of Rep. Dent), *reprinted in* Legislative History at 1034. *See also* Cohen, The Occupational Safety and Health Act: A Labor Lawyer's Overview, 33 Ohio St. L.J. 788, 799–802. *Cf. Phillips v. Interior Board of Mine Operations Appeals*, 1974, 163 U.S.App.D.C. 104, 110–114, 500 F.2d 772, 778–82 (Congressional intent in Coal Mine Safety and Health Act).

6. "It shall be an unfair labor practice for an employer . . . to discharge or otherwise discriminate against an employee because he has filed charges or otherwise given testimony under this Act." § 8(a)(4), National Labor Relations Act, 29 U.S.C. § 158(a)(4) (1970).

7. "No person shall discharge or in any . . . way discriminate . . . against any miner [because he] . . . notified the [agency] . . . of any alleged violation or danger, . . . filed, instituted or . . . . testified

Rights Act of 1964.[8] Courts have given these provisions broad constructions, furthering the purposes of the Acts by making employee enforcement easier. In *Scrivener v. NLRB*, 1972, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79, the Supreme Court upheld a construction of the NLRA provision that workers who made written statements to the board's examiners were protected by a statute that spoke only of "testimony". In *Phillips v. Interior Board of Mine Operations Appeals*, 1974, 163 U.S.App.D.C. 104, 500 F.2d 772, the Court, in the context of that particular working arrangement, read similar language to protect a miner who refused to work for safety reasons. The Court considered the refusal to work a complaint which, under the procedures at that mine, started in motion the administrative process. 163 U.S.App.D.C. at 110–113, 500 F.2d at 778–81. In *EEOC v. Kallir, Philips, Ross, Inc.*, 1975, S.D.N.Y., 401 F.Supp. 66, an employee had been fired for seeking information about her complaint from some of her employer's customers. The court held that she was protected in that endeavor by the Act. The majority properly points out that these precedents are not controlling. They do, however, furnish examples of broad judicial construction of provisions similar to the Secretary's regulation.[9]

### III.

The Court does not dispute the rationality of the regulation. Instead, it rests its conclusion on its reading of the legislative history. The exclusion of two provisions by Congress—the so-called "strike with pay" provision, and the original imminent danger provision—convinces the majority that Congress did not intend that workers have the right embodied in regulation 1977.12(b).

No clause in the Act leads to the conclusion that the statutory system is the exclusive remedy. Instead, the Court implies not merely a congressional unwillingness to directly grant these rights, but a congressional prohibition on this use of the Secretary of Labor's power. My reading of the legislative history convinces me that the majority is wrong.

The strike with pay provision was present in the Daniels Bill, reported by the House Committee on Education and Labor and supported strongly by organized labor. The provision was located in the section dealing with federal research on toxicity. It provided that employers or employees could request an HEW determination of the toxicity of any materials in their workplace. Within sixty days of that determination, the employer could not require that an employee be exposed to greater than toxic concentration unless the employee were informed of the hazards, the symptoms associated with the substance, and proper precautions for dealing with it. Furthermore, the employer had to furnish the employee with proper personal protective equipment. If those conditions were not met, an employee could be subjected to the toxic substance only if he could "absent himself from such risk of harm for the period necessary to avoid such danger without loss of regular compensation for such period".[10]

The rejection of that proposal has little bearing on this regulation. It was written to deal with problems of increasing concentrations of toxic substances, not immediate hazards. It spoke only of toxicity dangers, it did not require an imminent threat to life, and it was a remedy to be invoked only after 60 days without employer action. Unlike that provision, the regulation in ques-

---

... in any proceeding . . . ." 30 U.S.C. § 820(b)(1) (1970).

8. "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Title." § 704(a),

Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) (1970).

9. None of the three Acts considered above contains language similar to the "any other right afforded by this Act" phrase in § 11(c)(1).

10. H.R. 16785, 91st Cong., 2d Sess., § 19(a)(5) (1970) *reprinted in* Legislative History 755–56.

tion does not provide for an absence with pay.

The bills reported out of both House and Senate Committees originally contained provisions for administratively ordered shutdowns in cases of imminent danger. The bill as passed by the Senate provided:

"If the Secretary determines that the imminence of a danger is such that immediate action is necessary, and the Secretary determines that there is not sufficient time, in light of the nature and imminence of the danger, to seek and obtain a temporary restraining order   .   .   . the Secretary shall issue an order *requiring such steps to be taken as may be necessary to avoid, correct, or remove such imminent danger and prohibiting the employment or presence of any individual in locations or under conditions where such imminent danger exists .   .* Such order may remain in effect for not more than seventy-two hours from the time of its issuance.   If the Secretary delegates his authority to issue such an order to close a business or plant, in whole or in substantial part, he shall provide that such an order may not be issued until the employer has been notified in writing, signed by the delegate of the Secretary, setting forth specially the nature and imminence of the danger compelling immediate action and the concurrence of an official of the Labor Department appointed by the President with the advice and consent of the Senate is first obtained." [Emphasis added.] [11]

This provision differed significantly from the regulation promulgated by the Secretary of Labor.   First, it empowered an official to order the entire operation closed. Second, in some versions it allowed the official to order remedies on the spot.   Third, and most importantly, it relied upon action by the government.   In contrast, the regulation provides only that those workers endangered may refuse to work.   It does not allow them to order the employer to make changes.   And it relies on purely private actions, not those of the federal government.

A study of the legislative history shows that the last difference is crucial.   Opponents of the administrative shut-down order in both houses raised two major objections.

11.  S. 2193, 91st Cong., 2d Sess., § 12(b) (as passed by the Senate), *reprinted in* Legislative History at 562–63.

The Williams Act as originally proposed, S. 2193, 91st Cong., 1st Sess., § 6(a)(2) (1969), *reprinted in* Legislative History at 1, 12–13, allowed the Secretary to make such an order in imminent danger situations.   The order would have prohibited all employment at the site except for the purpose of eliminating the hazard, and would have remained in effect indefinitely pending the outcome of administrative proceedings.   As S. 2193 emerged from the Committee, it limited the duration of the order to 72 hours and required that a regional director of the Labor Department concur in the inspector's order.   S. 2193, 91st Cong., 2d Sess., § 11(b) (1970), *reprinted in* Legislative History at 263–64.   The Senate adopted amendments to that section which required that the Labor Department official authorizing the inspector's actions be one appointed with the advice and consent of the Senate, and requiring that the employer be notified of the reasons for the shutdown. 116 Cong.Rec. 37624–25 (1970), *reprinted in* Legislative History at 508–09;  116 Cong.Rec. 37621–22 (1970), *reprinted in* Legislative History at 499–500.   The Senate considered and narrowly rejected an amendment which would have eliminated the administrative power to order operations stopped.   116 Cong.Rec. 37601–05 (1970) (roll call vote, and debate) *reprinted in* Legislative History at 451–61.

In the House of Representatives, the Daniels Bill, H.R. 16785, 91st Cong., 2d Sess., § 12(a), authorized the Secretary to issue a shut-down order of 5 day duration.   *Reprinted in* Legislative History at 742.   That provision was reported out of Committee in the same form.   H.Rep. 1291, 91st Cong., 2d Sess., 41 (1970), *reprinted in* Legislative History at 871.   The Steiger-Sikes substitute bill, H.R. 19200, eliminated the administrative closure order entirely, in favor of district court injunctions.   H.R. 19200, 91st Cong., 2d Sess., § 12 (1970), *reprinted in* Legislative History at 763, 796–98.   Representative Daniels offered to amend his bill to conform to the substitute in this respect, 116 Cong.Rec. 38372, 38378 (1970), *reprinted in* Legislative History 993, 1009–10.   However, the Steiger-Sikes bill was adopted as a substitute to the Daniels bill by amendment, and then adopted. 116 Cong.Rec. 38723–33 (1970) (roll call votes on the amendment, adoption of bill), *reprinted in* Legislative History 1112–18.

It was feared that this provision was unconstitutional.[12] Opponents contended that giving a lone government inspector the power to close down an entire facility, without any judicial action, would deprive the employers of due process of law. This argument applies only to actions taken by the government. Private employees may refuse to work without violating due process.

The other reason advanced in opposition to this provision was that it would break the federal government's neutral role in labor-management relations.[13] Congressmen repeatedly voiced fears that inspectors would become federal pawns in battles between labor and management. But this provision could have prompted these fears only because it involved the power of the federal government. That workers might walk off the job could not have caused these fears by itself, because they already possessed a very similar right. Section 502 of the Taft-Hartley Act, 29 U.S.C. § 143, provides:

"[T]he quitting of labor by an employee or employees in good faith because of

abnormally dangerous conditions for work at the place of employment of such employee or employees [shall not] be deemed a strike under this chapter."

Safety strikes may be concerted activity, protected by § 7 of the National Labor Relations Act, 29 U.S.C. § 157. In such a case, the striking workers cannot be discharged. See N.L.R.B. v. Washington Aluminum Co., 1962, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298. Section 502 is significant because it carves an exception in no-strike clauses. Thus, despite the generally present express or implied no-strike clauses in collective bargaining agreements, a covered worker may still strike over safety matters. See N.L.R.B. v. Knight Morley Corp., 6 Cir. 1957, 251 F.2d 753, cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370; cf. Gateway Coal Co. v. U.M.W., 1974, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (adopting objective test of "abnormally dangerous conditions"); Banyard v. N.L.R.B., 1974, 164 U.S.App.D.C. 235, 241, 505 F.2d 342, 348 (applying Gateway).[14] Thus, the idea that workers could refuse to work

12. See H.R. 1291, 91st Cong., 2d Sess., 56 (1970), reprinted in Legislative History at 831, 886 (minority report); 116 Cong.Rec. 37338 (1970), reprinted in Legislative History at 425 (Sen. Dominick); 116 Cong.Rec. 37602 (1970), reprinted in Legislative History at 453 (Sen. Schweiker); 116 Cong.Rec. 37604 (1970), reprinted in Legislative History at 458 (Sen. Schweiker); 116 Cong.Rec. 38372 (1970), reprinted in Legislative History at 992 (Rep. Steiger); 116 Cong.Rec. 38379 (1970), reprinted in Legislative History at 1011–12 (Rep. Randall); 116 Cong.Rec. 38393 (1970), reprinted in Legislative History at 1050 (Rep. Michel); 116 Cong.Rec. 38713 (1970), reprinted in Legislative History at 1087 (Rep. Robison); 116 Cong. Rec. 42202 (1970), reprinted in Legislative History at 1205 (Rep. Quie). Cf. Note, Due Process and Employee Safety: Conflict in OSHA Enforcement Procedures, 84 Yale L.J. 1380 (1975) (general discussion of due process problems in the Act).

13. See H.R. 1291, 91st Cong., 2d Sess., 55–57 (1970), reprinted in Legislative History at 831, 885–87 (minority report); 116 Cong.Rec. 37346 (1970), reprinted in Legislative History at 448 ("breakdown of existing Government neutrality in labor-management relations", Sen. Tower); 116 Cong.Rec. 38393 (1970), reprinted in Legislative History at 1050 (Rep. Michel).

14. In Gateway Coal, the Court held that a particular safety dispute was encompassed in the implied no-strike clause of a collective bargaining agreement. However, the Court did not deny that § 502 would override such a no-strike clause. Instead, it held that for that section to be effective, the union would have to "present 'ascertainable, objective evidence supporting its conclusion that an abnormally dangerous condition for work exists.'" 414 U.S. 368, 386–87, 94 S.Ct. 629, 640–41, 38 L.Ed.2d 583, 596–97 (quoting the dissent in the Court of Appeals). In so doing it rejected the subjective interpretation given that phrase by the Third Circuit below. 3 Cir. 1972, 466 F.2d 1157, 1160. While the result in Gateway Coal has been criticized as restricting employee rights more than the Act intends, see Atleson, Threats to Health and Safety: Employee Self-Help Under the NLRA, 59 Minn.L.Rev. 647 (1975). Courts have continued to find some strikes immune from no-strike clauses because of § 502. See, e. g., Banyard v. N.L.R.B., 1974, 164 U.S.App.D.C. 235, 505 F.2d 342, Plain Dealer Publishing Co. v. Cleveland Typo. Union # 53, 6 Cir. 1975, 520 F.2d 1220, 1229 (district court opinion attached as appendix); United States Steel Corp. v. U.M.W., W.D.Pa.1974, 381 F.Supp. 990, 990–91.

in hazardous conditions was not unusual. Indeed, Section 502 was mentioned in the debate on this Act in the House of Representatives.[15] What was unusual was placing the power to close down an entire plant, with all its employees, in the hands of a lowly and perhaps vulnerable federal inspector. The potential for misuse of federal power disturbed Congress. Regulation 1977.12(b) poses no such threat. It is a right granted the employees, similar to but not exactly coextensive with the right granted by Section 502.[16] By limiting the inspectors' powers, Congress did not require us to reject this lifesaving regulation.

## IV.

The Congress that passed this Act did not intend to put the worker to the choice—his job or his life. As one of the co-sponsors of the legislation said:

> "We are talking about people's lives, not the indifference of some cost accountants. We are talking about assuring the men and women who work in our plants and factories that they will go home after a day's work with their bodies intact. We are talking about assuring our American workers who work with deadly chemicals that when they have accumulated a few years seniority they will not have accumulated lung congestion and poisons in their bodies, or something that will strike them down before they reach retirement age." [17]

We are talking about whether Jimmy Simpson had to lose his job to avoid return to a dangerous work-place high on a windswept skeleton of steel. Congress felt that workers could live with the prescribed processes of this Act. I cannot believe that it required workers to die for them. I respectfully dissent.

---

**15.** 116 Cong.Rec. 42208 (1970), *reprinted in* Legislative History at 1223–24 (Rep. Scherle).

**16.** § 502 only provides that no-strike clauses do not affect safety strikes, protected by § 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1970). Thus, to be protected a strike must be "concerted activity." *See N.L.R.B. v. Washington Aluminum Co.*, 1962, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298. Regulation 1977.12 protects any employee or employees, without requiring concerted activity. Furthermore, § 502 applies only to good faith quitting of labor because of abnormally dangerous conditions. As construed by the Supreme Court, this requires both good faith and objective, ascertainable support for the position that the conditions are in fact abnormally dangerous. *See* n. 14. The regulation requires only a reasonable belief that the employee is threatened with imminent danger of severe bodily harm or death *and* that the Act's provisions could not cure the danger in time. Thus, § 502 lacks an imminence requirement and does not require the threat to be of death or severe bodily harm. Neither does it require that other means be too slow to protect the employee. Regulation 1977.12(b) does not require that the imminent danger be "abnormal", nor does it incorporate a good faith requirement exclusive of "reasonableness".

**17.** 116 Cong.Rec. 37625 (1970), *reprinted in* Legislative History at 510 (Sen. Yarborough).